**Roger E. CLINE, Plaintiff,**

v.

**William M. FOX, Warden, and James Rubenstein, Commissioner, Defendants.**

**No. CIV.A. 1:00CV175.**

United States District Court, N.D. West Virginia.

March 19, 2003.

---

Robert M. Bastress, Esquire, Morgantown, WV, for Plaintiff Roger E. Cline.

Barry L. Koerber, Esquire, Assistant Attorney General, Charles Houdyschell, Esquire, Assistant Attorney General, Jendonnae L. Houdyschell, Attorney General Office, Esquire, Senior Assistant Attorney General, WV Division of Corrections, Charleston, WV, for Defendant William M. Fox, Warden.

Barry L. Koerber, Esquire, Assistant Attorney General, Charleston, WV, for Defendant James Rubenstein, Commissioner.

### ORDER

KEELEY, District Judge.

This matter comes before the Court on the parties' cross motions for summary judgment. The motions have been fully briefed, oral argument was heard by the Court, and the matters raised are ripe for review. For the reasons that follow, the Court **GRANTS** the defendants' motion for summary judgment, and **DISMISSES IN PART** and **DENIES IN PART** the plaintiff's motion for summary judgment.

### BACKGROUND

Plaintiff Roger Cline (Cline) is an inmate with the West Virginia Division of Corrections (DOC). Originally incarcerated in 1993, Cline has served time at DOC facilities located throughout West Virginia, including Moundsville, Huttonsville, Mount Olive, and Northern Regional Jail. From December 1998 until the present, Cline has been incarcerated at the St. Mary's Correctional Center (St.Mary's).

During his incarceration, Cline became an avid reader of the "Paper Wings" line of books, an adult-fiction serial published by Komar Publishing. Every two to three months, Cline received subscription installments of six Paper Wings books through the mail office at the institution where he was incarcerated. During his time at St. Mary's alone, Mr. Cline received five subscription packages.

Despite this regular infusion of new reading material, Cline was not able to build a private library because DOC property restrictions limit the number of per-

sonal items an inmate may possess at one time. Thus, each time a new Paper Wings package arrived, Cline had to ship the old package home to his mother.

This all ended on March 17, 2000, when prison officials intercepted Cline's latest Paper Wings package and held it in the mail room. Cline was told that he could not receive the package because the sender's name did not appear on St. Mary's "Approved Vendors List."

The Approved Vendors List is an official list of catalogs, publishing companies, magazines, and other sources of written material that an inmate may receive through the mail. Each DOC facility generates its own Approved Vendors List. In the judgment of prison officials, these vendors will only provide items permitted to inmates by prison rules and regulations ("Policy Directives").[1] Once approved internally by the warden, the Approved Vendor's List is sent to the DOC Commissioner for final approval. Each DOC facility keeps a copy of its Approved Vendors List in its mail room, and all incoming mail is checked against it. If the sender's name does not appear on the Approved Vendors List, the item is held in the mail office and the addressee inmate is notified of the delivery. The inmate may then make arrangements to return the item, destroy it, or have it forwarded to a third party.

If an inmate wishes to receive mail from an unlisted vendor, he may petition the Warden to amend to Approved Vendors List to include the new vendor. The inmate must first fill out a form and submit it to his Unit Manager, along with an example of the items sought to be added to the list. The Unit Manager then forwards the request to the Warden, who often consults with deputy wardens to determine

---

**1.** DOC Policy Directives are formulated by the DOC Commissioner and are applicable to all DOC institutions.

whether the inclusion of the new vendor will violate any DOC Policy Directives. The Warden's decision on amendments to the Approved Vendors List is final.

When he was denied his books, Cline petitioned Warden Fox to amend the St. Mary's Approved Vendors List to include Komar Publishing. Warden Fox referred the petition to Deputy Warden Tony LeMasters for a recommendation. LeMasters reviewed the examples provided with the petition and found a conflict with DOC Policy Directive 503.00, which states in pertinent part:

> Publications which pose a direct, clear and immediate danger to security, or which are obscene by depicting explicit sexual activity may be prohibited. (Policy Directive 503.00(V)(N)).
>
> *Obscene Material:* Periodicals, magazines, books, pamphlets, photographs, paintings, photocopies, sculpture or other graphic representation which are obscene because they depict explicit sexual activity. Explicit sexual activity is defined as sexual intercourse, anal intercourse, fellatio, cunnilingus, bestiality, bondage/Sadism and Masochism or material of an explicit sexual nature involving minors. (Policy Directive 503.00(III)).

Because DOC Policy Directive 503.00 prohibits inmates from receiving or possessing "obscene material," Deputy Warden LeMasters recommended that Cline's petition be denied. Warden Fox accepted Deputy LeMasters' recommendation and denied Cline's request to amend the Approved Vendors List to include Komar Publishing.

Cline grieved Warden Fox's decision within the DOC, and the decision was eventually upheld. On October 16, 2000, Cline filed a complaint pursuant to 28 U.S.C. § 1983, alleging that the refusal to permit his receipt of the Paper Wings books violated his constitutional rights under the First and Fourteenth Amendments.

During discovery, Cline gave an answer to an interrogatory indicating that books similar to Paper Wings were shelved in St. Mary's Reading Library. Warden Fox responded to this disclosure by closing the Reading Library and instructing Deputy Warden Sandy Tanczyn to review the library's contents and remove any material that violated the obscenity ban in DOC Policy Directive 503.00. Tanczyn formed an ad hoc staff of unit managers, counselors, case managers, and office assistants to individually read every book in the library. She distributed copies of Policy Directive 503.00 to the staff members, and instructed them to purge anything containing language that "could be derived as a sexual turn-on, according to the policy directive." When a staff member asked a question about what to do, Tanczyn simply pointed to the Policy Directive and told them to do the job "like the policy says." Tanczyn admits that her specific direction to eliminate any book that contained language that might arouse the reader was her own interpretation of the Policy Directive, and not that of Warden Fox.

The entire Reading Library review was completed in approximately two months. At its conclusion, the staff had purged 259 of the 1226 volumes, or nearly 21% of the library's total inventory. Among the books removed were William Styron's *Sophie's Choice*, Gore Vidal's *Myra Breckinridge*, and a number of works by John Updike.

Cline immediately amended his complaint on October 31, 2001 to allege that the library purge was a violation of his rights under the First and Fourteenth Amendments of the United States Constitution.

*ANALYSIS*

The parties do not dispute any facts on this cross-motion for summary judgment. Therefore, the Court need only determine which party is entitled to judgment as a matter of law on each of Cline's claims for relief. *See* Fed.R.Civ.P. 56(c) (summary judgment is appropriate when "there is no genuine issue as to any material fact, and ... the moving party is entitled to a judgment as a matter of law.").

The amended complaint challenges DOC Policy Directive 503.00 both on its face and as applied. Two of these claims are not decided here, however. First, Cline abandoned his facial challenge at oral argument, and therefore the Court does not consider it.[2] Moreover, the Court notes that many jurisdictions have upheld similar regulations. *See Waterman v. Farmer*, 183 F.3d 208 (3d Cir.1999); *Frost v. Symington*, 197 F.3d 348, 357 (9th Cir.1999); *Mauro v. Arpaio*, 188 F.3d 1054 (9th Cir. 1999); *Amatel v. Reno*, 156 F.3d 192 (D.C.Cir.1998).

■ Second, one of the as applied challenges is premature. Cline claims that "[t]he removal and suppression by the defendants and their agents of all materials from the [St. Mary's] reading library that includes passages that might sexually arouse the reader are irrational and unreasonable." While the record suggests that the library purge was a reflexive reaction to Cline's discovery response,[3] the record clearly indicates that Cline amended his complaint to include this claim before he grieved the offense within the West Virginia Division of Corrections. 42 U.S.C. § 1997e(a) unconditionally requires an inmate challenging his conditions of confinement to exhaust all administrative remedies before filing an action in district court. *See Porter v. Nussle*, 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) ("Once within the discretion of the district court, exhaustion in cases covered by § 1997e(a) is now mandatory."). Cline has not exhausted his administrative remedies for this claim and it must be dismissed.

This leaves only two as applied challenges to Policy Directive 503.00 before the Court: (1) that the DOC's use of and refusal to amend the approved vendors list to include the Paper Wings Books is unreasonable and irrational; and (2) that the defendants' refusal to permit Cline to receive and possess his Paper Wings books is unreasonable and irrational. These technically separate claims turn on the resolution of whether Policy Directive 503.00 was validly applied to prohibit Cline's possession of the Paper Wings books.

**A. Legal Standard.**

Where a plaintiff challenges the validity of a regulation as applied to his particular circumstance, the Court conducts its analysis under the framework established in *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct.

---

**2.** Cline's abandonment of the facial challenge is further evidenced by the fact that he failed to raise the issue in his brief.

**3.** The efficiency of the warden's response may have come at the expense of reasonableness. Is it rational that an effort to remove all "obscene" materials from the library would result in the expunging of William Styron's *Sophie's Choice*, Gore Vidal's *Myra Breckinridge*, and a number of works by John Updike? *See Aiello v. Litscher*, 104 F.Supp.2d

1068, 1080 (W.D.Wis.2000) (striking a state prison regulation where prison administrators classified a book containing photographs of Michelangelo's Sistine Chapel masterpiece as "pornography"); *see also Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 63, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973) (noting the "well nigh universal belief that good books, plays, and the arts lift the spirit, improve the mind, enrich the human personality, and develop character").

2254, 96 L.Ed.2d 64 (1987), and *Thornburgh v. Abbott,* 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989). *Shaw v. Murphy,* 532 U.S. 223, 232, 121 S.Ct. 1475, 149 L.Ed.2d 420 (2001).

■ In *Turner,* a class of Missouri prisoners challenged two Missouri Division of Corrections regulations: one restricting inter-inmate correspondence, and the other restricting inmate marriage. 482 U.S. at 81–82, 107 S.Ct. 2254. The inmates asserted that the regulations should be subject to strict scrutiny under *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). The Supreme Court held that prison regulations should not be held to such a high standard, and enunciated what has become known as the *Turner* rule: "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. at 89, 107 S.Ct. 2254. The Supreme Court provided four factors to guide a district court's application of this general principle:

First, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it . . .

A second factor . . . is whether there are alternative means of exercising the right that remain open to prison inmates . . .

A third consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally . . .

Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation. By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an exaggerated response to prison concerns.

*Id.,* 482 U.S. at 90–91, 107 S.Ct. 2254; *accord Veney v. Wyche,* 293 F.3d 726, 732 (4th Cir.2002).

Under this framework, the Supreme Court upheld the correspondence regulation, but invalidated the marriage restriction. In upholding the correspondence regulation, the Supreme Court noted that the asserted security interest was "undoubtedly" legitimate, that the plaintiffs' right to expression was not completely foreclosed by the inmate correspondence prohibition, and that permitting the plaintiffs to correspond freely would necessitate a "ripple effect" of additional security restrictions that would curtail other inmates' already limited freedom and put an unwarranted strain on prison resources. 482 U.S. at 91–93, 107 S.Ct. 2254.

In invalidating the marriage restriction, the Supreme Court first noted that the regulation—which prohibited not only inter-prisoner marriages, but also marriages between prisoners and free citizens—was overly broad because it limited the rights of free citizens. *Id.* at 97, 107 S.Ct. 2254. The Supreme Court stated that, while there may be some legitimate reasons to permit inmate marriage in limited circumstances, the Missouri regulation was an exaggerated response to those concerns. *Id.* at 97–98, 107 S.Ct. 2254. The prison officials' stated security concerns were not supported by common sense or the record. *Id.* at 98, 107 S.Ct. 2254. Because marriage to an outside citizen is an entirely private affair, the Court could not find that there would be any "ripple-effect" that would implicate the rights or liberties of other prisoners. *Id,* 107 S.Ct. 2254. Thus, the Supreme Court found that the marriage regulation was not reasonably related to any legitimate penological concern. *Id.*

The applicability of the *Turner* analysis to prison regulations was solidified in *Thornburgh v. Abbott*, 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989). There, a class of federal prisoners and publishers challenged a Federal Bureau of Prisons regulation that permitted prison officials to deny inmates possession of incoming publications if they were deemed "detrimental to institutional security." 490 U.S. at 403, 109 S.Ct. 1874 (*citing* 28 C.F.R. § 540.71(b)). The Supreme Court upheld the regulation, observing that the legitimacy of the security concern was "beyond question," *id.* at 415, 109 S.Ct. 1874, that the regulation was reasonably related to that concern because "[w]here the regulations at issue concern the entry of materials into the prison ... a regulation which gives prison authorities broad discretion is appropriate," *id.* at 416–17, 109 S.Ct. 1874, that the plaintiffs' rights were not impermissibly restricted because the regulation still permitted the inmates to receive "a broad range of publications," *id.* at 419, 109 S.Ct. 1874, and that there was a great likelihood that the materials would be recirculated within the prison, which would cause prison officials to expend limited resources to further restrict the freedom of other inmates, *id.*

■ The Fourth Circuit has observed that, in formulating the *Turner* analysis, "the Supreme Court chose the most deferential possible standard of review for cases presenting prison administration issues." *In re Long Term Admin. Segregation of Inmates Designated as Five Percenters,*

174 F.3d 464, 469 (4th Cir.1999). Prison officials " 'should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.' " *Id.* (*quoting Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)). Finally, "when a state correctional institution is involved, the deference of a federal court is even more appropriate." *In re Long Term,* 174 F.3d at 469.

## B. Application of the *Turner* Analysis.

### (1) Legitimate Penological Interest and Reasonable Relationship.

#### (i) *Legitimacy of the Underlying Policy.*

■ The policy undergirding the regulation must be legitimate, and, where First Amendment concerns are implicated, content-neutral. *Thornburgh,* 490 U.S. at 414, 109 S.Ct. 1874. The defendants assert that DOC Policy Objective 503.00 was promulgated to further the DOC's interest in preserving security and furthering inmate rehabilitation.[4] The legitimacy of these interests is plain. *See id.,* 490 U.S. at 415, 109 S.Ct. 1874 (recognizing that prison regulations designed to provide security are not only legitimate, but are "central to all other correctional goals"); *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (describing rehabilitation as a "valid penological objective"); *Procunier v. Martinez,*

4. The defendants specifically state that the Policy Directive was issued for three reasons: (1) to increase security by minimizing potential violence arising from bartering disputes in which obscene materials are used as barter items, (2) to minimize inmates' titillation and arousal, and (3) because obscene materials can negate prisoners' rehabilitation. The first and the third reasons are clearly security and

rehabilitation issues. The Court also finds the second reason to be a security issue insofar as such prevention reduces the incidence of sexual attacks between inmates. The Court also notes that this determination is a distinction without practical difference—the *Turner* standard requires prison officials to demonstrate a rational connection to a single legitimate penological concern, not three.

416 U.S. 396, 413, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974) (identifying "substantial government interests of security, order, and rehabilitation"); *Veney v. Wyche,* 293 F.3d 726, 732 (4th Cir.2002) ("Prison safety and security are legitimate penological interests.").

These interests are also content-neutral. The Supreme Court explained in *Thornburgh* that

> the Court's reference to "neutrality" in *Turner* was intended to go no further than its requirement in *Martinez* that "the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression." 416 U.S. at 413, 94 S.Ct. at 1811. Where, as here, prison administrators draw distinctions between publications solely on the basis of their potential implications for prison security, the regulations are "neutral" in the technical sense in which we meant and used that term in *Turner.*

490 U.S. at 41–16, 109 S.Ct. 1581 (footnotes omitted); *see also In re Long Term,* 174 F.3d at 470–71 ("Turner's only requirement of neutrality is that the interest being furthered be unrelated to the suppression of expression.") (internal quotation marks omitted). Here, the prohibition of the Paper Wings books advances Policy Directive 503.00's underlying interest in fostering security and rehabilitation. *See Amatel v. Reno,* 156 F.3d 192, 197–98 (D.C.Cir.1998) (explaining the neutrality requirement in the context of a prison regulation banning inmate receipt of sexually explicit material).

**(ii)** *Reasonable Relationship.*

This is "a rational relation test: once the Department demonstrates it is pursuing a legitimate governmental objective, and demonstrates some minimally rational re-

lationship between that objective and the means chosen to achieve that objective, we must approve of those means." *Hines v. South Carolina Dep't of Corrections,* 148 F.3d 353, 358 (4th Cir.1998). "The question is not whether [the warden's] conclusion was indisputably correct, but whether his conclusion was rational and therefore entitled to deference." *In re Long Term,* 174 F.3d at 470.

The threshold question is whether the defendants reasonably classified the Paper Wings books as "obscene material" as defined in Policy Directive 503.00. The Policy Directive defines "obscene material" as:

> Periodicals, magazines, books, pamphlets, photographs, paintings, photocopies, sculpture or other graphic representation which are obscene because they depict explicit sexual activity. Explicit sexual activity is defined as sexual intercourse, anal intercourse, fellatio, cunnilingus, bestiality, bondage/Sadism and Masochism or material of an explicit sexual nature involving minors.

While the materials from Paper Wings are books, and contain graphic descriptions of most of the sexual acts listed above, Cline steadfastly characterizes them as "sexually explicit novels," "erotic novels," or "erotic literature," and implies that they are something short of obscene.

Cline has submitted a copy of an entire Paper Wings book as an exhibit to his motion for summary judgment.[5] His characterization of this Paper Wings book as a "novel," however, misapprehends the nature of the literary form. A novel is a longer, complex work of prose addressing themes of human experience through a chronologically connected sequence of events. The Paper Wings book submitted by Cline resembles a novel only to the

**5.** *Hot Homemaker,* by Belle Spring.

extent that it is nearly 200 printed pages of text and bound along the left edge. Otherwise, it is a collection of graphically described sexual escapades taking place between and amongst a recurring cast of characters, separated only by terse and extremely secondary plot points.

For example, the first page of *Hot Homemaker* introduces the principal character, the aptly-named Randi, sitting in her bathroom, electric vibrator in hand, lamenting her marital sexual frustration. The next three pages describe Randi's nymphish physical attributes as she examines herself in the mirror. The following sixteen (16) pages find Randi recalling, in precise detail, the first act of sexual congress between her and her husband. Randi's reverie abruptly ends as her husband, for two pages, urges her from behind the bathroom door to dress herself so they may both attend a business dinner. Thus ends Chapter One.

The remaining nine chapters adhere to a similar structure of multiple pages of vividly described sexual activity bookended by minimal plot points. The only exception to this rule is Chapter Five, which is a twenty-one (21) page description of masturbation, fellatio, cunnilingus, vaginal intercourse, and anal intercourse—uninterrupted by any distracting plot points.

The Court acknowledges that Cline could have (though he did not) argued that the Paper Wings book makes passing at- tempts to address substantial themes. However, any hint of such a theme is quickly revealed as a thin plot device designed simply to create more situations for the characters to engage in varying, explicitly described, sexual acts. For example, at an early point in the exposition, Randi's husband reveals that he must make better use of his country club clubhouse during the slow winter months or he will face bankruptcy. The reader immediately learns, however, that the husband's solution is to operate the clubhouse as a winter "swing club," which provides a situs for most of the book's graphically described sexual encounters. At another point, Randi solicits a young, trim and fit restaurant waiter for an educational tour of the restaurant's wine-cellar. The highly detailed descriptions of sexual activity that immediately follow, though, teach the reader nothing of enology or viticulture.[6]

The Court finds that the Paper Wings book, on the whole, satisfies the definition of "obscene material" in Policy Directive 503.00,[7] and the defendants acted rationally in drawing a similar conclusion.

Cline argues that the Policy Directive's use of the word "depict" excepts the Paper Wings books, which contain only pure verbal descriptions and no pictures. It is true that the word "depict" often refers to pictorial representations. However, the standard dictionary definition also includes verbal descriptions, *see* Merriam–Webster Online Dictionary, www.m-w.com (defined

---

**6.** The descriptions do, however, offer the dubiously useful warning that rickety wine racks ought not be used to support oneself while performing sexual acrobatics.

**7.** Though not material to the Court's decision, the Court also finds that the Paper Wings book would be obscene under either the standard set forth in *Miller v. California*, 413 U.S. 15, 24, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) ("(a) whether the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest, (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law, and (c) whether the work, taken as whole, lacks serious literary, artistic, political, or scientific value."), or Justice Stewart's famous rule, *see Jacobellis v. Ohio*, 378 U.S. 184, 197, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring) ("I know it when I see it.").

term "depict"). The defendants could rationally base their conclusion on this more expansive definition.

The secondary question is whether the defendants could have rationally concluded that banning the Paper Wings books would advance any one of the legitimate penological purposes undergirding the Policy Directive. Common sense is the touchstone of rationality, and the Court need only find a common sense nexus between a legitimate penological interest and the asserted means of forwarding that interest. *See Amatel*, 156 F.3d at 199 (arguing that *Turner* does not require more than a common-sense connection because, "in that case, the Court scoured the record for evidence of a rational link between the asserted security interests an the marriage ban [only] because common sense does not suggest any.").

Such a common sense link exists in this case. Many courts have upheld broad prohibitions against inmate possession of pornographic, sexually explicit, or obscene materials, but few have summarized the rational link to furthering penological objectives as clearly as the D.C. Circuit in *Amatel:*

> We think that the government could rationally have seen a connection between pornography and rehabilitative values. Congress might well perceive pornography as tending generally to thwart the character growth of its consumers. One current exposition of this view sees pornography as treating women purely as objects of male sexual gratification. But this viewpoint shares at least a core with ideas that have a lineage of a few centuries, perhaps millennia, stressing the desirability of deferring gratification, of sublimation of sexual impulses, of channeling sexual expression into long-term relationships of caring and affection, of joining eros to agape. The supposition

that exclusion of pornography from prisons will have much of an impact in this direction may be optimistic, but it is not irrational.

156 F.3d at 199 (internal citations omitted).

Cline is dissatisfied with this commonly held position, however, and attacks it on two grounds. First, he states that "the solid weight of scientific authorities" rebuts the presumption that exposure to obscene materials can cause criminal activity. In support of this statement, Cline cites three sources: (1) the Report of the Attorney General's Commission on Pornography (1986); (2) Edward Donnerstien, Daniel Linz & Stephen Penrod, The Question of Pornography 177 (1987); and (3) Berl Kutchinskiy, Obscenity and Pornography: Behavioral Aspects, in Encyclopedia of Crime and Justice 1077, 1083 (Sanford Kadish, ed.1983).

The Court is somewhat skeptical of Cline's assertion in light of the fact that the Donnerstein article actually concluded that exposing "already angered men" to sexually explicit materials may risk briefly increasing their aggressive tendencies. Donnerstein at 40–48. Furthermore, as the *Amatel* court noted, there are many other academic sources suggesting a positive correlation between exposure to sexually explicit materials and criminal behavior. *See Amatel*, 156 F.3d at 199.

Where scientific studies are in equipose and the plaintiff cannot conclusively disprove the otherwise valid rational connection, the prison official's judgment must stand:

> But even undertaking to weigh the competing scholarship would misconceive the judicial role. Dealing with legislative judgments about rehabilitation, the Supreme Court has said that "[w]hen Congress undertakes to act in areas fraught with medical and scientific uncertainties, legislative options must be

especially broad and courts should be cautious not to rewrite legislation, even assuming, arguendo, that judges with more direct exposure to the problem might make wiser choices." *Marshall v. United States,* 414 U.S. 417, 427, 94 S.Ct. 700, 38 L.Ed.2d 618 (1974) (emphasis in original); *see also Kansas v. Hendricks,* 521 U.S. 346, 117 S.Ct. 2072, 2081 n. 3, 138 L.Ed.2d 501 (1997). And in upholding a statute barring provision of sexually explicit material to minors, the Court noted that "while these studies all agree that a causal link [between exposure to explicit material and impaired ethical and moral development] has not been demonstrated, they are equally agreed that a causal link has not been disproved either." *Ginsberg v. New York,* 390 U.S. 629, 642, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968) (internal quotation omitted); *see also American Booksellers Ass'n v. Hudnut,* 771 F.2d 323, 329 n. 3 (7th Cir.1985). The same uncertainty prevails here, and suffices to place the legislative judgment within the realm of reason under the standards applicable to the political branches' management of prisons.

*Amatel,* 156 F.3d at 199.

Cline also argues that the defendants fail to demonstrate a rational connection because the prison discipline records indicate that, not only is he a model inmate, but none of the feared violence or rehabilitative setbacks has ever occurred at St. Mary's. The defendants, however, need not make such a showing. "[I]t is rational for [a prison administrator] to exclude materials that, although not necessarily 'likely' to lead to violence, are determined by the warden to create an intolerable risk of disorder under the conditions of a particular prison at a particular time." *Thornburgh,* 490 U.S. at 417, 109 S.Ct. 1874. The Court will not tie the defendants' hands by forcing them to wait until viola-

tions occur before permitting them to enforce the regulation. The prison officials reasonably see a need for preventive measures, and the Court must defer to that rational decision.

**(2) Alternative Means of Exercising the Right.**

Cline asserts that the enforcement of Policy Directive 503.00 against the Paper Wings books leaves him without a means of exercising his protected right to read "erotic literature."

Before deciding that an inmate plaintiff is without a means to exercise a right, the Court must define the right in question. Moreover, "[t]he right in question must be viewed sensibly and expansively." *Thornburgh,* 490 U.S. at 417, 109 S.Ct. 1874.

■ The First Amendment encompasses a general right to receive information. *See Reno v. ACLU,* 521 U.S. 844, 874, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) (invalidating a statute because it "effectively suppresses a large amount of speech that adults have a constitutional right to receive and to address to one another"); *Stanley v. Georgia,* 394 U.S. 557, 564, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969) ("[T]he right to receive information and ideas, regardless of their social worth ... is fundamental to our free society."); *see also Bd. of Educ. v. Pico,* 457 U.S. 853, 867–68, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982) (plurality opinion) ("[T]he right to receive ideas follows ineluctably from the sender's First Amendment right to send them."). Inmates do not cede this right upon entering prison. *See Crofton v. Roe,* 170 F.3d 957, 959 (9th Cir.1999) ("It is well settled that the First Amendment protects the flow of information to prisoners."); *Mann v. Smith,* 796 F.2d 79, 82–83 (5th Cir.1986) (same). The Third Circuit has implicitly acknowledged that prisoners have a right to re-

ceive and read publications. *See Waterman v. Farmer,* 183 F.3d 208, 218–19 (3d Cir.1999). Moreover, the Ninth Circuit recognizes a "right to receive sexually explicit communications." *Frost v. Symington,* 197 F.3d 348, 357 (9th Cir.1999); *Mauro v. Arpaio,* 188 F.3d 1054, 1061 (9th Cir.1999). The D.C. Circuit, however, has questioned whether prisoners possess "some minimum entitlement to smut." *Amatel,* 156 F.3d at 201 (D.C.Cir.1998).

In *Thornburgh,* the Supreme Court did not define the inmate's right as narrowly as Cline would like. Instead, it explained that, although sexually explicit material was banned, "the regulations at issue ... permit a broad range of [other] publications to be ... received, and read, [and thus] this factor is clearly satisfied." 490 U.S. at 418, 109 S.Ct. 1874. Similarly, because Policy Directive 503.00 only restricts obscene materials and permits Cline to receive non-obscene materials, including "commercial pornography," there are alternative means by which Cline might exercise his rights under the First Amendment.

**(3) Impact of Accommodating the Asserted Right.**

Cline asserts that there would be no burden on the safe operation of the prisons if he was allowed to read erotic fiction, and points to his "spotless record" during the seven years when he received Paper Wings books. The defendants offer no argument on this point.

Cline's argument addresses only the impact upon himself, but ignores the more important cost to the penological objectives with regard to his fellow inmates. In *Thornburgh,* the Supreme Court acknowledged that simply allowing this type of material into the prison environment invites a panoply of problems:

We deal here with incoming publications, material requested by an individual inmate but targeted to a general audience. Once in the prison, material of this kind reasonably may be expected to circulate among prisoners, with the concomitant potential for coordinated disruptive conduct. Furthermore, prisoners may observe particular material in the possession of a fellow prisoner, draw inferences about their fellow's beliefs, sexual orientation, or gang affiliations from that material, and cause disorder by acting accordingly. [citations omitted] "The problem is not ... in the individual reading the materials in most cases. The problem is in the material getting into the prison."

490 U.S. at 412–13, 109 S.Ct. 1874.

Furthermore, "publications can present a security threat, and [a district court may properly find] that a more closely tailored standard could result in admission of publications which, even if they did not lead directly to violence, would exacerbate tensions and lead indirectly to disorder." *Id.,* at 416, 109 S.Ct. 1874 (internal quotation marks omitted). This extra security threat is typically and understandably met by prison officials with additional restrictions on inmates' other freedoms. *See Turner,* 482 U.S. at 92, 107 S.Ct. 2254 (acknowledging that permitting prisoners to freely correspond with each other would come "at the cost of significantly less liberty and safety for everyone else, guards and prisoners alike").

"Where the exercise of a right requires this kind of a tradeoff, we think that the choice made by corrections officials— which is, after all, a judgment 'peculiarly within [their] province and professional expertise,'—*should not be lightly set aside by the courts.*" *Id.,* at 92–93, 107 S.Ct. 2254 (*quoting Pell v. Procunier,* 417 U.S. 817,

827, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974)) (emphasis in original).

**(4) Exaggerated Response.**

"[I]f an inmate claimant can point to an alternative that fully accommodates the prisoners rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Turner,* 482 U.S. at 90–91, 107 S.Ct. 2254. Cline suggests two ready alternatives available to the prison as evidence that the Directive is not reasonable: (1) individual determinations, rather than a blanket rule, can be made to ascertain which prisoners may receive sexually explicit material; and (2) only pictorial representations of sexual explicit material should be banned.

The Supreme Court has already addressed an argument similar to Cline's first point. In *Turner,* in upholding the correspondence restriction, the Supreme Court noted that prison officials need not expend their limited resources to provide the significantly extra security measures necessary to accommodate the plaintiff's asserted right. 482 U.S. at 93, 107 S.Ct. 2254. Moreover, "[w]here prison officials are able to demonstrate that they have rejected a less restrictive alternative because of reasonably founded fears that it will lead to greater harm, they succeed in demonstrating that the alternative they in fact selected was not an exaggerated response under *Turner.* Furthermore, the administrative inconvenience of [the] proposed alternative is also a factor to be considered." *Thornburgh,* 490 U.S. at 419, 109 S.Ct. 1874.

The defendants argue that Cline's proposed alternatives are unworkable. The prison lacks sufficient mailroom staff to individually screen all incoming mail. Forcing the existing staff to individually

determine what material can go to what prisoner risks dangerous materials inadvertently ending up in the hands of a prohibited inmate. As noted above, the cost of allowing any of contraband inside the prison is high. The only way to prevent this result is to hire more staff to handle the added duties. This is not a *de minimis* alternative.

Cline's second proposed solution, only allowing a ban of pictorial obscenity, asks the Court to substitute its judgment for that of the prison officials and rewrite the Policy Directive. For the reasons stated above, this is something the Court cannot do.

***Conclusion.***

■ West Virginia Department of Corrections Policy Directive 503.00, as applied to prohibit the plaintiff's possession of his Paper Wings books, is constitutional. The defendants acted reasonably in classifying the Paper Wings books as "obscene material" under the Policy Directive. For the reasons stated above,

1. The Court **DISMISSES WITHOUT PREJUDICE** the plaintiff's facial challenge to Policy Directive 503.00 because the plaintiff abandoned that challenge; and **DISMISSES WITHOUT PREJUDICE** the plaintiff's as applied challenge to the library purge because the plaintiff has not exhausted his administrative remedies with respect to that challenge.

2. The Court **DENIES** the remainder of the plaintiff's Motion for Summary Judgment, **GRANTS** the defendants' Motion for Summary Judgment on the two issues addressed in this Order, and **DISMISSES WITH PREJUDICE** the remainder of the case.

It is so **ORDERED.**

The Clerk is directed to transmit copies of this Order to counsel of record herein.