**Roger E. CLINE, Plaintiff,**

v.

**William M. FOX, Warden, and James Rubenstein, Commissioner, Defendants.**

**No. CIV.A.1:00 CV 175.**

United States District Court, N.D. West Virginia.

May 7, 2004.

Robert M. Bastress, Esquire, WVU College of Law, Morgantown, WV, for Plaintiff Roger E. Cline.

Barry L. Koerber, Esquire, Assistant Attorney General, Charles Houdyschell, Esquire, Assistant Attorney General, Jendonnae L. Houdyschell, Attorney General Office, State Capitol Complex, Charleston, WV, Daynus Jividen, Esquire, Senior Assistant Attorney General, WV Division of Corrections, Charleston, WV, for Defendant William M. Fox, Warden.

Barry L. Koerber, Esquire, Assistant Attorney General, Charleston, WV, for Defendant James Rubenstein, Commissioner.

## MEMORANDUM OPINION AND ORDER

KEELEY, District Judge.

Before the Court are cross-motions for summary judgment filed by the plaintiff, Roger Cline, and the defendants, William F. Fox and James Rubenstein. Generally stated, the question presented by these motions is whether West Virginia Department of Corrections Policy Directive 503.00,[1] on its face and as applied, is unconstitutional. The Court finds that Policy Directive 503.00(V)(P), in particular, is not reasonably related to legitimate penological objectives insofar as it prohibits reading materials with any written depictions of sexual conduct but permits commercial pornography. Therefore, the Court concludes that Policy Directive 503.00(V)(P) is invalid, on its face and as applied, under the First and Fourteenth Amendments of the United States Constitution. Accordingly, the Court **GRANTS** the plaintiff's motion and **DENIES** the defendants' motion.

## I. BACKGROUND AND PROCEDURAL HISTORY

Plaintiff Roger Cline, an inmate with the West Virginia Division of Corrections ("DOC"), has been incarcerated at the St. Mary's Correctional Center ("St.Mary's") since December 1998. At St. Mary's, Cline ordered and received several "Paper Wings" adult-fiction books. On March 17, 2000, however, prison officials intercepted Cline's most recent shipment of Paper Wings books because the sender's name did not appear on St. Mary's "Approved Vendors List." In response, Cline petitioned the defendant, Warden William M. Fox, to amend the Approved Vendors List to include Komar Publishing, which publishes Paper Wings.

Warden Fox referred the petition to Deputy Warden Tony LeMasters, who determined that the Paper Wings books contained "obscene material" as defined by DOC Policy Directive 503.00(III). According to Policy Directive 503.00(V)(P), inmates cannot receive or possess obscene material; therefore, Deputy Warden LeMasters recommended denial of Cline's petition. Warden Fox adopted this recommendation and refused to add Komar Publishing to the Approved Vendors List. After unsuccessfully grieving this decision

---

1. A complete copy of Policy Directive 503.00 is appended to this Memorandum Opinion and Order.

within the DOC, Cline filed a complaint pursuant to 28 U.S.C. § 1983 on October 16, 2000. He alleged that prohibiting his receipt of the Paper Wings books violated his constitutional rights under the First and Fourteenth Amendments.

During discovery of the original § 1983 claim,[2] Cline gave an answer to an interrogatory indicating that books similar to Paper Wings were shelved in St. Mary's Reading Library. Warden Fox responded to this disclosure by closing the library and instructing Deputy Warden Sandy Tanczyn to review its contents and remove any material that violated the obscenity ban in DOC Policy Directive 503.00. Tanczyn formed an ad hoc staff of unit managers, counselors, case managers, and office assistants to individually read every book in the library. She distributed copies of Policy Directive 503.00 to the staff members, and instructed them to purge anything containing language that "could be derived as a sexual turn-on, according to the policy directive." (Tanczyn Depo. at 16.) When a staff member inquired about how to make this judgment, Tanczyn simply told them to "[j]ust go by the policy directive." (*Id.* at 18.) Tanczyn admits that her specific direction to eliminate any book that contained language that might arouse the reader was her own interpretation of the Policy Directive, and not that of Warden Fox.

The entire Reading Library review was completed in approximately two months. At its conclusion, the staff had purged 259 of the 1226 volumes, or nearly 21% of the library's total inventory. Among the books removed were William Styron's *So-*

*phie's Choice,* Gore Vidal's *Myra Breckinridge,* and a number of works by John Updike.

Cline immediately amended his complaint on October 31, 2001 to allege that the library purge was a violation of his rights under the First and Fourteenth Amendments of the United States Constitution. On March 19, 2003, this Court dismissed the new claim without prejudice because Cline had failed to exhaust his administrative remedies. *Cline I,* 266 F.Supp.2d 489, 501 (N.D.W.Va.2003). Nonetheless, in its Order, the Court upheld the constitutionality of DOC Policy Directive 503.00 as applied to his possession of Paper Wings books. *Id.*

On March 26, 2003, Cline moved the Court to reconsider its March 19, 2003 Order to the extent it dismissed the library purge claim for failure to exhaust administrative remedies. The Court granted the motion and retained jurisdiction over this case to consider the constitutionality of DOC Policy Directive 503.00 on its face and, specifically, as applied to the removal of books from the prison library.

## II. ANALYSIS

At issue is the constitutionality of a prison regulation that prohibits inmate access to all reading materials containing a "sexually explicit" passage, but allows inmates to possess commercial pornography.[3] Cline asserts that DOC Policy Directive 503.00, on its face and as applied, is unreasonably overbroad and fails to consider "a work's dominant themes and content or its value." Conversely, Warden Fox argues

---

2. The Court adjudicated Cline's original § 1983 claim in *Cline v. Fox,* 266 F.Supp.2d 489 (N.D.W.Va.2003), hereinafter referred to as *"Cline I."*

3. In *Cline I,* the Court held that DOC Policy Directive 503.00, "as applied to prohibit the plaintiff's possession of his Paper Wings

[adult fiction] books, is constitutional." 266 F.Supp.2d at 501. At that stage in the litigation, however, Cline did not pursue a facial challenge to the policy, which is now squarely before the Court. The factual context of the as applied challenge in the case at bar is also readily distinguishable from that in *Cline I,* requiring a different legal analysis.

that the regulation does not implicate Cline's constitutional rights and is otherwise reasonably related to legitimate penological interests.

The parties do not dispute any material facts on the cross-motion for summary judgment. Therefore, the Court need only determine which party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

## A. The Asserted Right

Warden Fox first contends that the prison's removal of any library books pursuant to Policy Directive 503.00 is not constitutionally suspect because inmates have no constitutional right to a reading library. *See Counts v. Newhart,* 951 F.Supp. 579, 587 (E.D.Va.1996) ("The Constitution contains no right of access to a general-literary library ...."); *May v. Baldwin,* 895 F.Supp. 1398, 1405 (D.Or.1995) (finding no constitutional right to general prison library privileges). He further maintains that, to the extent there could be a constitutional violation, Cline cannot advance a claim because he has not suffered actual harm.

█ The Court agrees—and Cline also concedes—that the Constitution does not require prisons to provide a reading library for their inmates. Even so, it does not necessarily follow that, once a prison offers access to a library, it has unfettered discretion to regulate the library's contents. *See Bd. of Edu., Island Trees Union Free Sch. Dist. No. 26 v. Pico,* 457 U.S. 853, 870–72, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982) (plurality) (prohibiting the improp-

erly motivated removal of certain books from a school library); *cf. also Neinast v. Bd. of Trs. of the Columbus Metro. Library,* 346 F.3d 585, 591 (6th Cir.2003) (holding that a public library is a limited public forum); *Kreimer v. Bureau of Police for the Town of Morristown,* 958 F.2d 1242, 1259 (3d Cir.1992) (same). In *Pico,* the plurality held that, notwithstanding a school board's "broad discretion in the management of school affairs," *id.* at 863, 102 S.Ct. 2799, the First Amendment limits this discretion to *remove* books from a school library. *Id.* at 869–72, 102 S.Ct. 2799. Like prisoners, public school students have no constitutional right to a school library and otherwise must bear certain restrictions on their rights generally. *See, e.g., id.* at 861–64, 102 S.Ct. 2799; *see Counts,* 951 F.Supp. at 587. Thus, the defendants fail to persuade the Court that the First Amendment cannot impose *any* limitations on the discretion of prison officials in removing books from prison library shelves simply because a prisoner has no right to be provided a library.[4]

█ In the case at bar, Cline has standing to assert a claim with respect to the library purge. As this Court held in *Cline I,* inmates have a First Amendment right to receive information. 266 F.Supp.2d at 499. Inmates exercise that constitutional right when they read books from the prison library. *See Kreimer,* 958 F.2d at 1256 (observing that a public library is the " 'quintessential' locus for the exercise of the right to receive information and ideas' "). Thus, a prison's selective

4. Even if the removal of library books did not implicate Cline's constitutional rights, he could still assert his facial challenge to Policy Directive 503.00, which applies to inmates' personal possession of certain reading materials. *See Newsom v. Albemarle County Sch. Bd.,* 354 F.3d 249, 257 (4th Cir.2003) (noting that, under the overbreadth doctrine, "an individual may 'challenge a statute on its face

because it also threatens others not before the court—those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid' ") (quoting *Bd. of Airport Comm'rs v. Jews for Jesus, Inc.,* 482 U.S. 569, 574, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987)).

removal of library books restricts an inmate's right to receive information. *Cf. Pico,* 457 U.S. at 866, 102 S.Ct. 2799 ("[T]he First Amendment rights of students may be directly and sharply implicated by the removal of books from the shelves of a school library."). Since DOC Policy Directive 503.00 operates to deny Cline access to numerous books, he has a cognizable claim for violation of his constitutional rights. *See Elrod v. Burns,* 427 U.S. 347, 373–74, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") (citing *New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971)).

## B. Standard of Law

█ Ordinarily, courts determine the validity of an allegedly overbroad regulation by considering whether it "reaches a substantial amount of constitutionally protected conduct." *City of Houston v. Hill,* 482 U.S. 451, 458, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987) (quoting *Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982)). In the prison context, however, a court must "uphold [the] regulation, even one circumscribing constitutionally protected interests, so long as it 'is reasonably related to legitimate penological interests.'" *Amatel v. Reno,* 156 F.3d 192, 196 (D.C.Cir.1998) (quoting *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)). "This standard reflects a basic reality of conviction and confinement: Although prisoners are not completely without the Constitution's protection, '[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.'" *In re Long Term Admin. Segregation of Inmates Designated as Five Percenters,* 174 F.3d 464,

469 (4th Cir.1999) (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987)).

█ In *Turner v. Safley,* the Supreme Court identified four factors that are "relevant in determining the reasonableness of the regulation at issue":

First, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it. . . .

A second factor . . . is whether there are alternative means of exercising the right that remain open to prison inmates . . . .

A third consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally . . .

Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation. By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an exaggerated response to prison concerns.

482 U.S. at 89–90, 107 S.Ct. 2254 (citations omitted); *see Abbott,* 490 U.S. at 414, 109 S.Ct. 1874.

The *Turner* framework accords prison officials "'wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'" *In re Long Term,* 174 F.3d at 469 (quoting *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)). Thus, "[i]n the volatile prison environment, it is essential that prison officials be given broad discretion to prevent . . . disorder" that could be caused by certain reading materials accessible to prisoners. *Thornburgh,* 490 U.S. at 413, 109 S.Ct. 1874.

Moreover, "[w]hen a state correctional institution is involved, the deference of a federal court is even more appropriate." *In re Long Term,* 174 F.3d at 469.

## C. Application of the *Turner* Factors

### 1. *Legitimate Penological Interest and Rational Relationship*

■ The underlying objective of Policy Directive 503.00 must be legitimate and content-neutral. *Abbott,* 490 U.S. at 414–15, 109 S.Ct. 1874; *Cline I,* 266 F.Supp.2d at 495. According to Warden Fox, the DOC promulgated the policy to preserve security generally and prevent sexual assaults specifically. He also states that the policy furthers inmate rehabilitation. These objectives are legitimate and content neutral. *Cline I,* 266 F.Supp.2d at 495–96.

■ After finding a legitimate objective, the Court must approve of the library regulation if Warden Fox establishes "some minimally rational relationship between that objective and the means chosen to achieve that objective." *Hines v. S.C. Dep't of Corrections,* 148 F.3d 353, 358 (4th Cir.1998). "Thus, a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Turner,* 482 U.S. at 89–90, 107 S.Ct. 2254. "The question is not whether [the warden's] conclusion was indisputably correct, but whether his conclusion was rational and therefore entitled to deference." *In re Long Term,* 174 F.3d at 470.[5]

Policy Directive 503.00(V)(P) prohibits inmates from "receiving/possessing obscene material, private pornography or pornographic paraphernalia." Material is "obscene" if it depicts "explicit sexual activity," defined as "sexual intercourse, anal intercourse, fellatio, cunnilingus, bestiality, bondage/Sadism and Masochism or material of an explicit nature involving minors." Private pornography is any graphic representation of nudity that "has not been published for widespread commercial viewing," which generally includes "nude or semi-nude photographs" of an inmate's acquaintance, spouse, or family member. W. Va. DOC Pol'y Dir. 503.00(III). Pornographic paraphernalia is "[a]ny object or device, which is to be used to stimulate sexual organs or which[ ] is attached to or inserted into genitalia or the anus." *Id.*

In forbidding "obscene material," Policy Directive 503.00(V)(P) is extraordinarily far-reaching. Reasonably interpreted, the policy prohibits all books, magazines, paintings, and photographs that contain even one depiction of sexual intercourse. *See* Pol'y Dir. 503.00(III). The prohibition also applies regardless of the context of the depiction or the content of the work as a whole. Therefore, literary classics like George Orwell's *1984* and religious texts like the Bible [6] technically violate this regulation. It is difficult to understand how denying inmates access to such books promotes security, prevents sexual assaults, or furthers rehabilitation.

---

**5.** Notwithstanding *Turner*'s guidance to engage in a multiple factor inquiry in cases involving prisoners' constitutional rights, the Supreme Court and the Fourth Circuit precedent cited here indicate that the legitimate objective/rational relationship test may be outcome determinative.

**6.** The Court observes, however, that prison officials did not remove the Bible from the library shelves. *But see, e.g.,* 2 Sam. 11:1–5 (The New Living Translation) ("Late one afternoon David got out of bed after taking a nap and went for a stroll on the roof of the palace. As he looked out over the city, he noticed a woman of unusual beauty taking a bath.... Then David sent for her; and when she came to the palace, he slept with her.").

The rationality of Policy Directive 503.00(V)(P) becomes more questionable in light of the prison's allowance of commercial pornography. Pol'y Dir. 503.00(III). Consequently, the policy permits magazines such as *Playboy* or *Maxim*, which objectify women in order to sexually arouse or gratify men. (LeMasters Depo. at 38.) But the policy would certainly forbid James Joyce's *Ulysses*,[7] ostensibly because such books "create an intolerable risk of disorder." (Def. Supp. Memo. at 12, quoting *Abbott*, 490 U.S. at 417, 109 S.Ct. 1874.)

In view of the library regulation's substantial overbreadth and incongruities, the Court cannot find any logical connection between Policy Directive 503.00(V)(P) and its intended goals. To curtail sexual assaults, the regulation presumptively prohibits *The Canterbury Tales* but welcomes *Playboy*. To further rehabilitation, the policy bans works from Pulitzer Prize winning novelists [8] but allows "soft porn." *Cf. Aiello v. Litscher*, 104 F.Supp.2d 1068, 1081 (W.D.Wis.2000) ("Numerous courts of appeal have recognized the state's legitimate concern that the presence of pornography among offenders may hamper rehabilitation, particularly sex offenders, threaten security and lead to increased incidence of sexual harassment of female officers."). Such regulation smacks of irrationality, particularly considering that over a third of the inmate population are sex offenders—a statistic emphasized by Warden Fox. (Def. Supp. Memo. at 1.)

■ As applied, Policy Directive 503.00 proscribes an even broader range of materials. Deputy Warden Tanczyn directed prison staff to expunge books with any sexually arousing content. Tanczyn's instruction, however, fails to comport with the plain language of Policy Directive 503.00(III), which does not define "explicit sexual activity" in terms of capacity to sexually arouse. Moreover, any prohibition on "sexually arousing" books would necessarily encompass allowable commercial pornography, "whose *primary purpose* is to cause sexual arousal." Dictionary.com, http://dictionary.reference.com (defining "pornography") (last visited Apr. 19, 2004) (emphasis added). This self-contradictory application of Policy Directive 503.00(V)(P) is also clearly irrational.

### 2. *Alternative Means of Exercising the Right*

■ "Where 'other avenues' remain available for the exercise of the asserted right, courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation." *Turner*, 482 at 90, 107 S.Ct. 2254 (quoting *Pell v. Procunier*, 417 U.S. 817, 827, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974)) (citation omitted). " '[T]he right' in question must be viewed sensibly and expansively." *Abbott*, 490 U.S. at 417, 109 S.Ct. 1874.

As previously discussed, Cline has a constitutional right to receive information. The parties' respective interpretations of this right, however, predictably diverge. Cline asserts that he has the right to receive books and magazines that have redeeming social value despite containing

**7.** The Modern Library named *Ulysses* the best novel of the twentieth century—despite its "sexually explicit" content. *See* The Modern Library, "100 Best Novels," *at* http://www.randomhouse.com/modernlibrary/100best.html (last visited Apr. 8, 2004).

**8.** Cline identified at least three such individuals: John Updike, Jane Smiley, and William Styron. (Pl. Mot. for Summ. J. at 8.) He also noted that prison officials removed books from several other best selling authors, including John Grisham, Scott Turow, Gore Vidal, Robert Ludlum, Sidney Sheldon, Judith Krantz, and Danielle Steele. (*Id.*)

at least one depiction of a sexual act. Warden Fox views the right more globally, essentially arguing that Cline has no right to any particular genre of reading materials.

Generally, the "right to receive information and ideas, regardless of their social worth, is fundamental to our free society." *Stanley v. Georgia,* 394 U.S. 557, 564, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969) (citing *Winters v. New York,* 333 U.S. 507, 510, 68 S.Ct. 665, 92 L.Ed. 840 (1948)). Therefore, if this right holds any meaning for inmates, it at least includes the right to receive books of some literary value. *See Pell,* 417 U.S. at 822, 94 S.Ct. 2800 ("[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."). Nevertheless, not all such books contain "sexually explicit" passages, as literally defined by Policy Directive 503.00 or as interpreted by prison officials. Accordingly, because the policy allows inmates access to an otherwise broad range of "good books," the Court must conclude that the alternative means factor is "clearly satisfied." *Abbott,* 490 U.S. at 418, 109 S.Ct. 1874.

### 3. Impact of Accommodating the Asserted Right

■ Warden Fox contends that "accommodating plaintiff's *request*" for the return of purged library books will jeopardize prison security and inmate rehabilitation. (Def. Supp. Memo. at 13.) For purposes of the *Turner* analysis, however, only Cline's *rights* are at issue. Thus, the Court must consider how accommodating Cline's right to receive certain types of literature—not his desire for the replacement of all purged library books—will affect prison officials and inmates.

Although Warden Fox misapprehends the extent of possible relief,[9] his arguments remain conclusory and unpersuasive. He fails to explain how allowing inmates to read books that have some literary value but describe sexual conduct will "create an intolerable risk of disorder," even if the sexual references are *de minimus.* Likewise, he does not offer any evidence indicating that such books will "detrimentally impact the rehabilitative programs and counseling" of inmates who have committed sexual offenses. (Def. Supp. Memo. at 13.) Therefore, the Court finds that accommodating Cline's right is unlikely to have any significant negative impact on either prison officials or inmates. To the contrary, some of the otherwise prohibited literature may benefit inmates. *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 63, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973) ("[G]ood books, plays, and the arts lift the spirit, improve the mind, enrich the human personality, and develop character.").

### 4. Absence of Ready Alternatives

■ "[I]f an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimus* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Turner,* 482 U.S. at 91, 107 S.Ct. 2254. Cline maintains that a more narrowly drawn publications policy that considers the independent value of reading materials is a reasonable alternative. He also observes that several courts have upheld narrower regulations that sufficiently restrict access to sexually explicit materials. *See, e.g., Thornburgh v. Abbott,* 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d

---

9. Indeed, as this Court has already ruled, the DOC's prohibition of certain sexually explicit adult fiction books is constitutionally permissible. *Cline I,* 266 F.Supp.2d at 501.

459 (1989); *Amatel v. Reno,* 156 F.3d 192, 194, 202 (D.C.Cir.1998).

The *Abbott* case, in particular, vindicates Cline's assertion that ready alternatives to Policy Directive 503.00 exist. In *Abbott,* the Supreme Court upheld the facial validity of a federal prison regulation that permitted wardens to reject "sexually explicit" material involving (1) homosexuality, (2) sadomasochism, (3) bestiality, or (4) children. 490 U.S. at 405 n. 6, 419, 109 S.Ct. 1874. The first three categories of sexually explicit material could be admitted, however, if the warden determined that they did not "pose a threat at the local institution" or had "scholarly, or general social or literary, value." *Id.* at 405 n. 6, 109 S.Ct. 1874.

The regulation in *Abbott* demonstrates that a warden can censor materials that jeopardize security and rehabilitation while also accommodating inmates' right to receive information. Although the regulation may not be suitable for St. Mary's (and thus need not be adopted verbatim), it offers one of many ready alternatives to Policy Directive 503.00, on its face and as applied.

■ In sum, despite its legitimate objectives, DOC Policy Directive 503.00(V)(P) is irrational insofar as it bans "sexually explicit" reading material but allows commercial pornography. Nonetheless, Cline has alternative means to exercise his right to receive publications with some literary value. Accommodating his right to receive such books that also contain sexual references, however, is generally unlikely to endanger security or inmate rehabilitation.[10] Moreover, effective alternative regulations are readily available for the prison to implement and could alleviate the defendants' concerns.

After weighing all of the *Turner* factors, the Court concludes that, to the extent that Policy Directive 503.00(V)(P) prohibits all depictions of sexual conduct while permitting commercial pornography, it is not reasonably related to a legitimate penological interest. Thus, on its face and as applied, the policy impermissibly infringes Cline's constitutional right to receive information.

**C. Extent of Prospective Relief**

■ Having found a constitutional violation, the Court must consider the appropriate remedy in the unique prison context. Under 18 U.S.C. § 3626(a)(1)(A),

[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

Clearly, the defendants must amend Policy Directive 503.00 in a manner consistent with this Court's orders and other governing federal law. Cline further demands replacement of all books removed from the prison library. (Compl. at 5.) This remedy, however, is not "narrowly drawn." Indeed, if any of the purged books are similar to the Paper Wings series, as Cline has asserted, Warden Fox has no obligation to return them. *See Cline I,* 266 F.Supp.2d at 501. Moreover, Cline has not indicated

---

10. Of course, prison officials may still forbid such books if they pose a threat to security, inhibit rehabilitation or otherwise promote disorder.

whether he wished to read all or just some of the 259 purged books.

The proper relief in the case at bar must remedy the constitutional violation without usurping the discretion of the defendants. Because Policy Directive 503.00(V)(P) is facially invalid, the library purge as conducted was unauthorized. *See Giovani Carandola, Ltd. v. Bason,* 303 F.3d 507, 512 (4th Cir.2002). As discussed above, however, it is unlikely that Cline and the other St. Mary's inmates are entitled to every book removed by the prison staff. Therefore, the Court **ORDERS** defendants to amend their publications policy in a manner consistent with this Memorandum Opinion and Order and to screen the purged books under that amended policy before replacing the books on the prison library shelves.

### III. CONCLUSION

Based on the foregoing analysis,

1) The Court **GRANTS** the plaintiff's motion for summary judgment as to the library purge (dkt. no. 49) and **DENIES** the defendant's motion for summary judgment on this issue (dkt. nos. 47, 70).

2) The Court **DECLARES** that West Virginia Department of Corrections Policy Directive 503.00(V)(P), on its face and as applied, violates the First and Fourteenth Amendments insofar as it prohibits books with any written depictions of sexual conduct but permits commercial pornography.

3) The Court **ENJOINS** the enforcement of Policy Directive 503.00(V)(P) to the extent it contravenes this Memorandum Opinion and Order.

4) The Court **ORDERS** the defendants to amend the policy in a manner consistent with this Court's orders and other governing federal law.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to counsel of record.

### Appendix A
STATE OF WEST VIRGINIA DIVISION OF CORRECTIONS POLICY DIRECTIVE

NUMBER: 503.00

DATE: 01 April 2000

SUBJECT: Mail Privileges for Inmates

AUTHORITY: WV Code 25-1-5 25-1-18 and 62-13-4; ACA Standards 3-4429 through 3-4438

I. POLICY: It is the policy of the West Virginia Division of Corrections to maintain a mechanism that ensures maximum inmate correspondence.

II. CANCELLATION: Policy Directive 503.00, dated 01 December 1999

III. DEFINITIONS:

*Privileged Mail:* Shall include written communications and letters to or from the courts, officials of the Division of Corrections, other State and local elected and appointed officials, the news media, Grand Juries, law enforcement agents or agencies and the Board of Probation and Parole.

*Attorney/Client Mail:* Any written correspondence to or from an inmate and his/her attorney of record. Such correspondence must clearly state "legal mail" on the envelope or must clearly indicate it is from the inmate's attorney of record.

*General Correspondence:* Shall include all written communications and letters which are not privileged mail. Outgoing and incoming general correspondence may be opened, inspected for contraband and read.

*Non–Indigent Inmate:* Any inmate who has $5.00 or more in his/her spending or

voluntary savings account at any time during the calendar month.

*Allowable Commercial Pornography:* Periodicals, magazines, books or pamphlets which depict graphic representations of a nude person, or with exposed breasts, genitalia or buttocks and which has been published for commercial, widespread and non-selective viewing, but which are not obscene as defined in this policy.

*Obscene Material:* Periodicals, magazines, books, pamphlets, photographs, paintings, photocopies, sculpture or other graphic representation which are obscene because they depict explicit sexual activity. Explicit sexual activity is defined as sexual intercourse, anal intercourse, fellatio, cunnilingus, bestiality, bondage/Sadism and Masochism or material of an explicit nature involving minors.

*Pornographic Paraphernalia:* Any object or device, which is to be used to stimulate sexual organs or which, is attached to or inserted into genitalia or the anus.

*Private Pornography:* Photograph, photocopy, drawing or other graphic representation which depicts a person totally nude or with exposed breasts, genitalia or buttocks and which has not been published for widespread commercial viewing. This category usually consists of, but is not limited to, nude or semi-nude photographs of an inmate's friend, spouse, family member or other person with whom the inmate is or was acquainted.

IV. APPLICABILITY: All units within the Division of Corrections

V. PROCEDURE:

A. Inmates may correspond with any person, except inmates in special housing (administrative and punitive segregation).

1. There shall be no limit on the number of correspondents an inmate may have.

2. All envelopes shall contain the inmate's name, D.O.C. number and the address of the institution/facility/center in which he/she is housed.

B. Inmates may correspond with inmates incarcerated in Division of Corrections' institutions/facilities/centers and with inmates in out of state institutions/facilities/centers.

1. Inmates wishing to correspond with inmates incarcerated in West Virginia Division of Corrections' institutions/facilities/centers must comply with the stipulations in B–2 "a" through "d" below.

2. Inmates wishing to correspond with inmates in out of state institutions/facilities/centers must first receive written permission from the Warden/Administrator of both the sending and receiving institutions/facilities/centers (Attachment # 1) *and* comply with the stipulations in B–2 "a" through "d".

a. Inmate to inmate letters must be placed in mail depositories or the Institutional Post Office in an open (unsealed), stamped envelope, and are subject to be read by designated institutional authorities.

b. Inmate to inmate letters must be only written correspondence and not contain any items, money or other articles.

c. Inmate to inmate letters must not contain information that is a threat to the life and safety of others, or that can be considered disruptive to the orderly administration of any institution/facility/center within the Division of Corrections.

d. Inmate to inmate letters will be appropriately stamped on the envel-

ope by the sending institution with initials or abbreviations identifying the sending institution/facility/center.

C. Each institution shall provide secure mailboxes, which inmates have access to and establish collection times.

1. Every effort shall be made to assure that such mail is delivered to the U.S. Postal Service on the same day, except as otherwise specified in this directive concerning security issues.

2. Outgoing general correspondence will be placed in the mailboxes sealed.

 a. The Division of Corrections may randomly inspect and read such correspondence.

 b. The Warden/Administrator shall designate those persons approved to read outgoing correspondence.

 c. Any information found in outgoing correspondence which is considered a threat to safety and security issues of criminal activity shall be given to the Chief Correctional Officer no later than the next regular business day.

 d. Any information gathered of a private nature concerning an inmate or his/her family while in the process of reading and inspecting outgoing correspondence is of a private nature, and must be handled discreetly.

3. Outgoing privileged correspondence cannot be delayed, opened or read, unless there are reasonable grounds to believe that such mail poses a threat to institutional safety and/or security.

4. Inmates are required to utilize a return address, to include their name, DOC number, institutional/facility/center name and address.

5. Attorney client mail that is outgoing may only be delayed, opened or read when there is reasonable grounds to believe such mail may pose a threat to institutional safety and/or security.

D. Incoming privileged mail shall be opened and inspected for contraband.

1. All such privileged mail will only be opened in the presence of the inmate, if the Warden/Administrator believes there is reasonable cause to suspect:

 a. The mail is counterfeit.

 b. The mail contains contraband.

2. If the Warden/Administrator/designee makes either of the above determinations in Section V, D, 1–a and b, privileged mail may be opened and read, provided the following safeguards are applied:

 a. The inmate and the sender shall be notified in writing that their correspondence will be read;

 b. The inmate has the right to appeal the reading of his/her mail through the established grievance procedure;

 c. The privileged mail is opened in the presence of the inmate.

E. In every instance where the Warden/Administrator/designee makes either of the determinations to open the privileged mail, he/she shall fully describe the reasons, facts and circumstances upon which the determination is based.

1. This documentation will be provided to a disinterested party.

2. The disinterested party shall review the determination.

F. Incoming general correspondence may be opened outside the presence of the inmate only to:

1. Inspect for contraband.

2. To collect enclosed money orders, checks or monies.

 a. Incoming general correspondence is subject to random reading by correctional staff.

 b. The Warden/Administrator shall designate those persons approved to read incoming correspondence.

 c. Any information found in incoming correspondence which is considered a threat to safety and security issues or criminal activity shall be given to the Chief Correctional Officer no later than the next regular business day.

 d. Any information gathered of a private nature concerning an inspecting incoming correspondence is of a private nature, and must be handled discreetly.

G. Incoming certified checks and money orders received on behalf of inmates shall be promptly recorded and credited to the inmate's account, with a signed receipt provided to the inmate.

1. No certified check or money order will be accepted for amounts greater than fifty dollars ($50.00).

 a. If such a certified check or money order is received, it shall be considered contraband. (Attachment # 2)

 b. The inmate will be given a confiscated property receipt and given the option of sending it home at their expense, destroy it or donate it to the Chaplain.

2. Each institution/facility/center shall maintain accurate records concerning certified checks and money orders so received. These records shall include date, sender, amount received and the receipt number provided to the inmate.

3. Incoming personal checks will not be accepted and will be returned to the sender.

4. The sending of cash to an inmate is not permitted.

 a. If cash is received, it will be promptly returned to the sender, at the inmate's expense.

 b. The sender, if known, and the inmate will be specifically informed that the practice is not permitted (Attachment # 2).

 c. If the sender is unknown, the cash will be treated as contraband cash, and disposed of as per policy.

H. Staff members who open privileged mail or read general correspondence in violation of this directive may face discipline actions.

I. If an inmate files a complaint/grievance concerning mail privileges and procedures, said complaint/grievance shall be completed within five (5) days of the alleged incident.

J. An indigent inmate will be provided a maximum often (10), 1–ounce or less, postage-free letters per month.

1. This monthly allowance to indigent inmates is not transferable or cumulative from month to month.

2. This limit cannot be exceeded by borrowing from another inmate.

3. The cost of posting letters weighing more than 1–ounce will be deducted from the total monthly allowance available to the indigent inmate.

4. An indigent inmate will be provided postage over the amount established for the purpose of mailing privileged mail within reasonable limitations, as determined by the Warden/Administrator.

5. Writing materials to include pens, pencils, paper and envelopes will be

provided to indigent inmates in reasonable quantities, as determined by the Warden/Administrator.

K. Incoming certified/registered inmate mail will be processed as all other mail and delivered to the addressee upon securing a signed receipt for same.

1. A log of incoming certified mail will be kept by the Institutional Post Office.

2. The log shall document the inmate's name, D.O.C. number, the date correspondence was given to inmate and the signature of the inmate.

L. Outgoing certified/registered mail shall be permitted if the inmate sender has funds to pay for such service. In all respects, this mail shall be handled as regular, first class, outgoing mail.

M. Books, magazines, newspapers and other periodicals will be accepted for delivery to an inmate only if the publication has been sent directly from the publisher.

1. This does not apply to the receipt of textbooks and related instructional materials for education programs, which have received the prior approval of the Warden/Administrator/designee.

2. Inmates ordering publications must forward full payment for the subscription with his/her order.

a. Installment/deferred subscription payments are not permitted.

b. Non-incarcerated persons may give periodical subscriptions or books to inmates by having the publisher mail the publication directly to the inmate.

3. An inmate may receive up to a total of five (5) total subscriptions, with any combination of newspapers or periodicals.

4. Catalogs are not considered periodicals or regular correspondence and

therefore are not permitted to be received by inmates.

5. Inmates are not permitted to utilize coupons or advertisements found in publications for free articles or samples to be sent into the institution.

N. Publications which pose a direct, clear and immediate danger to security, or which are obscene by depicting explicit sexual activity may be prohibited.

O. Each institution/facility/center shall establish rules and regulations governing the receipt of packaged materials through the mails, in accordance with the institution/facility/center security needs.

P. Inmates are prohibited from receiving/possessing obscene material, private pornography or pornographic paraphernalia, as defined in this policy (Attachment # 3).

Q. Privileged mail may be opened and inspected in the inmate's presence. However, it may not be read unless there are reasonable grounds to believe that such mail poses a threat to institutional safety and/or security.

R. Attorney/Client mail may be opened and inspected, in the inmate's presence. However, it may not be read.

S. The following sign shall be posted at all mail collection points:

"ALL INCOMING AND OUTGOING MAIL, EXCEPT ATTORNEY/CLIENT MAIL, MAY BE MONITORED, READ, AND IF NECESSARY, COPIED. ALL LEGAL MAIL WILL BE SEARCHED AND INSPECTED FOR CONTRABAND, AS DEFINED BY STATE LAW, DIVISIONAL POLICY AND INSTITUTIONAL PROCEDURES"

T. First–Class letters and packages shall be forwarded.

1. When an inmate is transferred to another institution/facility/center or

released from custody, his/her first-class letters and packages shall be forwarded to his/her new address if one is available.

2. If an inmate moves from his/her established forwarding address or

failed to establish a forwarding address at the time of his/her release, all first-class letters or packages will be returned to sender.

Approved Signature: Paul Kirby, Commissioner 4-1-2000

Policy Directive 503.00
01 April 2000
Attachment #1

INSTITUTION NAME

WV DIVISION OF CORRECTIONS LETTERHEAD

MEMORANDUM

TO:
FROM:
DATE:
RE: Inter–Inmate Correspondence
 The following inmate, _____, Division of
Corrections' Number _____, is currently incarcerated in the _____
_____.

 This inmate requests permission to correspond with inmate _____
_____, Division of Corrections' Number _____,
currently incarcerated in your institution/facility/center.

 Please complete this form and return it to me.

 I approve/disapprove this inmate correspondence.

 _____
 Warden/Administrator
 Policy Directive 503.00
 01 April 2000
 Attachment #2

INSTITUTION NAME

WV DIVISION OF CORRECTIONS LETTERHEAD

 DATE

Mr. or Mrs. _____,

Due to our policies on the reception of cash/certified check/money orders in our institutions/facilities/centers, the enclosed cash/certified check/money order is considered contraband and is being returned to you because:

It is cash or a certified check or money order for greater than fifty-dollars ($50.00), and therefore, not permitted.

Inmate _____, DOC # _____, has been notified of this and has the right to appeal this decision to the Warden/Administrator within five (5) business days.

SIGNATURE BLOCK FOR
POST OFFICE STAFF
Policy Directive 503.00
01 April 2000
Attachment #3

INSTITUTION NAME

WV DIVISION OF CORRECTIONS LETTERHEAD

DATE

Mr. or Mrs. _____,

Due to our policies on items allowed in our institutions, the enclosed item(s) are considered contraband and are being returned to you because:

_____A. It is a periodical, magazine, book, pamphlet, photograph, painting, photocopy, sculpture or other graphic representation which is considered obscene because it depicts sexual intercourse, anal intercourse, fellatio, cunnilingus, bestiality, or material of an explicit nature involving minors.

_____B. It is a photograph, photocopy, drawing or other graphic representation of a person nude or semi-nude that has *not* been published for widespread commercial viewing.

_____C. It is an object or device to be used in stimulating sexual organs.

Inmate _____, DOC # _____, has been notified of this and has the right to appeal this decision to the Warden/Administrator within five (5) business days.

SIGNATURE BLOCK FOR
POST OFFICE STAFF